**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

UNITED STATES OF AMERICA

v.                                             CRIMINAL  ACTION  NO. 3:08-00236

ZACHARY JOSE MERRITT

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Zachary Jose Merritt's Motion to Suppress. [Doc. No. 28].  On February 23, 2009, this Court held a hearing on the motion.  At the close of the hearing, the Court directed Defendant to file a supplemental brief and the Government to file a supplemental response.  After receiving the Government's response, Defendant moved to adjourn the trial date and requested permission to file a reply after he had the opportunity to review a transcript of the hearing.  The Court granted the motions, and briefing on the motion is now complete.  After considering the evidence presented and the arguments by the parties, the Court **DENIES** Defendant's motion.

**I.
FACTS**

On August 28, 2008, Sergeant Darrell Booth of the Huntington Police Department and the Huntington Violent Crime and Drug Task Force was in an unmarked car conducting surveillance of Defendant who was a passenger in a car driven by his girlfriend, Erica Adkins.  At the time, Sergeant Booth was aware that there was an outstanding warrant from the State of Michigan for Defendant's arrest.  Sergeant Booth testified that during the surveillance he observed Defendant engage in what appeared to be drug transactions.  Ultimately, marked patrol cars were

called and the vehicle was stopped.  Defendant was arrested and taken from the scene within minutes.  A K-9 unit also was called to the scene.  Ms. Adkins' car was searched, but nothing was found.

Sergeant Booth testified that the car was stopped a little after 5:00 p.m.[1] *Motion Hearing Tr.* at 7 and 17.  It is undisputed that at the time of the stop, Ms. Adkins was placed in handcuffs to insure the officers' safety and placed in a patrol car.  Sergeant Booth testified that the handcuffs were removed within three minutes, and Ms. Adkins was placed in the front seat of his vehicle.  Once in the vehicle, Ms. Adkins was given her Miranda rights, and Sergeant Booth explained to her why she was stopped.  Sergeant Booth also requested the right to search her apartment because Defendant was known to stay there and Sergeant Booth explained to her that he believed controlled substances were located there.  A waiver form reflects that Ms. Adkins was given her Miranda rights at 5:40 p.m., and she signed the form at 5:50 p.m.  Ms. Adkins then signed a consent to search form, and the form was signed as witnessed by Sergeant Booth at 5:58 p.m.  Sergeant Booth testified that he fully explained to Ms. Adkins that she could revoke her consent to search at any time.  Sergeant Booth stated he never made any threats to obtain her consent to search, she never indicated that she did not understand either her Miranda warnings or the consent to search form, and she never told him that she wanted to rescind her consent.  Sergeant Booth drove Ms. Adkins to her apartment, and they sat in his car while other officers began the search at 6:01 p.m.

---

[1]At another point in his testimony, Sergeant Booth said the stop occurred around 5:35 p.m. *Motion Hearing Tr.* at 33.  For purposes of this motion, the Court will assume the stop occurred around 5:00 p.m. as that time is consistent with Ms. Adkins' testimony.

While sitting in the car, Sergeant Booth testified Ms. Adkins appeared comfortable with him and they made small talk.  Sergeant Booth also stated that Ms. Adkins was given the opportunity to smoke and enter the apartment during the search to use the restroom.  During the small talk, Sergeant Booth said that Ms. Adkins told him that the officers in the apartment "may want to look in the drawer[.]" *Id.* at 13.  Crack cocaine was found in the drawer.

At some point during the search, Sergeant Booth was called inside, so Sergeant Michael Oglesby sat outside with Ms. Adkins.  Sergeant Oglesby testified that Ms. Adkins never informed him that she wanted to withdraw her consent.  Sergeant Oglesby also stated that she did not appear upset or distressed, but that she did seem confused by why the police arrested Defendant because she believed he was small-time drug dealer and there were many big-time dealers in the area.  Sergeant Oglesby further said he never threatened Ms. Adkins, nor heard anyone else threaten her.

Following the search, Ms. Adkins signed a Waiver of Rights form at 7:44 p.m. Sergeant Booth testified that she was lucid, aware, and calm when she signed the form and acknowledged that she understood all of it.  Ms. Adkins then gave a hand-written statement that the drugs found in the apartment belonged to Defendant.  In her statement, Ms. Adkins wrote:

> I, Erica Adkins, live at 319½ 8th Ave Htgn. WV with Zachary Merritt my boyfriend of about a year. Thursday Aug 28th I gave the police permission to search my house. There they found drugs. The drugs do not belong to me. They do belong to my boyfriend he has put the drugs in there before. I've seen the scale before.  I've pushed the button on the scale.  In the past I have thrown away plastic bags from around

-3-

the same area.  I've seen him put the drugs in there.
I've been with him when he did a deal.  I was driving
and we picked someone up.  I saw him give the drugs
and receive money.  This happened before around 10
times.

*Written Statement of Erica Adkins*.  Following the statement is a written question "[d]o you swear
this statement is true so help you God?"  With a written answer of "yes." *Id*.  Ms. Adkins signed the
statement at 8:35 p.m.  Sergeant Booth stated there were never any threats made in order to get her
to give her statement.

Ms. Adkins testified at the hearing that she dropped out of school in the eleventh
grade and has not completed a GED.  On the day in question, she said that she and Defendant were
driving to Wal-Mart when the police pulled them over around 5:00 p.m.  She stated they were
ordered from the car and handcuffed, and at least two officers had their weapons drawn.  She said
she was scared because she did not think she had done anything wrong.  She testified that she was
placed in the back of a patrol car and one of the officers approached her and said that he knew who
she was and said "You're eight to ten." *Motion Hearing Tr.* at 48.  She said she interpreted the
comment to mean she was facing eight to ten years of imprisonment.  She said she never gave the
officers permission to search her vehicle.

Ms. Adkins estimated she was in the patrol car for approximately ten to fifteen
minutes before she was taken outside the car.  She said she was still handcuffed once outside the car,
and the officers talked to her for about fifteen to twenty minutes.  She stated the officers told her
they believed Defendant to be a drug dealer and there they believed drugs were in her apartment.

-4-

She said they asked for permission to search, but she told them she did not want to give them permission.  She testified she was told if she did not give them permission they would kick her door down and, if they had to get a search warrant, they would take her into custody.  She said she told them no several times, and at one point, Detective Paul Hunter came over to her and said "I'm going to just say 'F' it and just take her to f'g jail." *Id*. at 53.[2]  She said Detective Hunter was yelling in her face and she felt threatened.  She testified that Detective Hunter was the only officer who cursed at her.  She stated she was getting emotional, and Sergeant Booth told someone to get the handcuffs off her and he took her to his car.  She said about forty-five minutes passed between the time of the initial stop and the time she signed the consent form.  She testified she did not want to sign the form, but she felt like she had to do so or she would be faced with eight to ten years of imprisonment.

On cross-examination, Ms. Adkins said she read and understood her rights at the time, but she "didn't really feel like it was true at the time . . . ." *Id*. at 57.  She said she understood she did not have to consent to the search, but she did not want to go to jail.  She denied ever being told that she could rescind her consent.  She stated she did not know there were drugs in the apartment and she never told Sergeant Booth to look in the drawer where the drugs were found.  She did admit that she knew Defendant dealt drugs, but she denied driving him around to carry out deals.  She said her written statement was a lie, and she wrote it in response to questions asked of her in a way she thought the police wanted.  She also said she did not want to see her boyfriend go to prison.

## II.

---

[2]Detective Hunter did not testify at the hearing.

## ANALYSIS

The Fourth Amendment requires law enforcement officers to procure a warrant before a search is conducted unless there is a valid exception. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  Voluntary consent is a well-established exception to the warrant requirement. *Id*. The sole issue raised by Defendant in this case is whether Ms. Adkins' consent to search her apartment was voluntary.  Defendant does not contest that Ms. Adkins had authority to consent to the search; he merely argues the consent was involuntary and, therefore, the evidence taken from the apartment must be suppressed.  As stated by the Fourth Circuit in *United States v. Lattimore*, 87 F.3d 647 (4th Cir. 1996), a court must look to the totality of the circumstances in deciding whether consent was freely and voluntarily given. 87 F.3d at 650 (citation omitted).  This analysis includes considering the characteristics of the individual granting the consent "(such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *Id*. (citations omitted).  Knowledge of a right to refuse consent is relevant to the analysis, but need not be established to prove voluntary consent. *Id*. (citations omitted).

In this case, the Court recognizes that Ms. Adkins is young and dropped out of school.  However, she is an adult, and the Court finds she was well spoken for her age.  When the Court explained at the hearing of her right not to answer questions that may incriminate her, she

indicated she understood her right.[3]  The Court has no reason to doubt that representation.  Likewise, she said she understood her oath to answer questions truthfully.  Observing Ms. Adkins while testifying, the Court finds she had no difficulty understanding the questions asked of her and she appeared to be of at least average intelligence and maturity.

In considering the testimony regarding the stop, the Court notes it was daylight and it occurred within the City of Huntington.  After the car was stopped, officers drew their weapons and ordered Ms. Adkins and Defendant out of the car.  The Court credits Ms. Adkins' testimony that she was scared when this occurred.  Once outside the car, Defendant was handcuffed and taken from the scene within minutes, and Ms. Adkins was handcuffed and placed in a patrol car.  According to Ms. Adkins she remained handcuffed in the patrol car for about ten to fifteen minutes and she continued to be handcuffed for about fifteen to twenty minutes outside the car.  Even if the Court assumes this to be true, it was a relatively short amount of time.  Moreover, assuming Ms. Adkins' testimony that she was handcuffed for a total of approximately twenty-five to thirty-five minutes, it is uncontested that she was not handcuffed when she was talking to Sergeant Booth in his car. During that time, Ms. Adkins signed the voluntary rights waiver form and then she signed the consent to search form, which was witnessed by Sergeant Booth at 5:58 p.m.  Thus, by the time she signed the consent, the tension from the initial stop had long been defused.  In any event, neither the fact the officers drew their weapons or the fact Ms. Adkins was handcuffed establishes her consent

---

[3]At the time of the motion hearing, Ms. Adkins was not charged with any offense. Subsequently, on March 4, 2009, Ms. Adkins was indicted for conspiracy to distribute 50 grams or more of cocaine base.

was involuntary. *United States v. Elie*, 111 F.3d 1135, 1145 (4th Cir. 1997)[4] (holding "neither the drawing of a gun by an arresting officer, nor the handcuffing of the accused establishes involuntariness in and of itself" (internal quotation marks and citations omitted)).

Ms. Adkins testified that Detective Hunter cursed and yelled at her and she believed from the officers' comments that she would be taken to jail if she did not consent. However, after this event allegedly occurred with Detective Hunter, Sergeant Booth had her unhandcuffed and took her to his vehicle. The Court believes Sergeant Booth's testimony that he told Ms. Adkins she was not being arrested and she should relax. The Court further believes Sergeant Booth's testimony that he explained to her why she was stopped and why the police wanted to search her apartment. Ms. Adkins' testimony is consistent with Sergeant Booth's testimony that he read her Miranda rights to her and she said she understood those rights. The Court also credits Sergeant Booth's testimony that after she signed that form, he read the consent form to her. The Consent to Search form specifically states:

> I, Adkins, Erica Nicole, having been informed of my Constitutional right not to have a search made of the premises and/or vehicle hereafter described without a search warrant and of my absolute right to refuse to consent to such a search, knowing that if any incriminating material is found it can be used against me in Court, do hereby authorize HPD Drug/Unit + HVC/TF Detective Booth, . . . (illegible), a member of the Federal Drug Task Force, to conduct a complete search of my premises and/or vehicle described as 319 ½ 8th Ave Hgh WV.

---

[4]*Abrogated on other grounds, U.S. v. Sterling*, 283 F.3d 216, 219 (4th Cir. 2002).

> The above named Officer(s) is authorized by me to take from my premises and/or vehicle any letters, papers, materials or other property which he may desire.
>
> This written permission is given by me to the above Officer(s) voluntarily and without threats or promises of any kind.

*Federal Drug Task Force Consent to Search*.  The Court notes that Ms. Adkins' testimony that she only signed the consent because she was threatened is directly contrary to her signed consent.  Ms. Adkins' written consent supports a finding that her consent was voluntary. *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001) (stating "[w]ritten consent supports a finding that the consent was voluntary").   In addition, on cross examination, Ms. Adkins testified that she understood she did not have to give permission for the police to search her apartment.  Such knowledge is a relevant factor for the Court to consider when determining whether the consent was voluntary. *Lattimore*, 87 F.3d at 650 (holding "[w]hether the accused knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of consent, although the Government need not determine that the defendant knew of his right to refuse consent to prove that the consent was voluntary" (citation omitted)).

Sergeant Booth further stated Ms. Adkins seemed comfortable, relaxed, and at ease when they went to her apartment.  This testimony is consistent with Sergeant Oglesby's testimony that, while Ms. Adkins seemed confused about why the police were going after her boyfriend, she did not seem upset or distressed.  In fact, according to Sergeant Booth, Ms. Adkins cooperated by

telling him where drugs could be found.[5]  At no point did Ms. Adkins revoke her consent.  Although

Ms. Adkins denies she was ever told she could rescind her consent, the Court finds this testimony

not credible.  Ms. Adkins agreed that Sergeant Booth read and explained her Miranda rights to her,

and this Court finds Sergeant Booth's testimony credible that he did the same with the consent form,

including his statement that he "made [it] emphatically clear . . . she could rescind that consent . . . ."

*Motion Hearing Tr.* at 12.  After the search concluded, Ms. Adkins signed a waiver of her Miranda

rights and cooperated by giving her hand-written statement.  It is not contested that Ms. Adkins was

not free to leave during this entire period, but "[i]f an individual voluntarily consents to a search

while justifiably detained on reasonable suspicion, the products of the search are admissible." *United*

*States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001) (citing *Florida v. Royer*, 460 U.S. 491 (1983)).


        Given the totality of the circumstances in this case, the Court finds that the

Government has met its burden to prove Ms. Adkins' consent was voluntary.  Accordingly, the

Court **DENIES** Defendant's Motion to Suppress. [Doc. No. 28].


        The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to

counsel and the defendant, the U.S. Attorney's Office, the U.S. Probation Office, and the U.S.

Marshals' Service.

                         ENTER:        March 24, 2009

                         ROBERT C. CHAMBERS
                         UNITED STATES DISTRICT JUDGE

        [5]As previously mentioned, Ms. Adkins denied telling Sergeant Booth there were drugs in the
silverware drawer.

                                        -10-